19-20210, Illinois Tool Works v. Rust-Oleum Corporation. And we have an exhibit from the appellant. This is for the third case. Oh, this is the third case. Okay, thank you. Mr. Jones, whenever you're ready. Thank you, Your Honor. ITW's case suffers from a fatal lack of evidence on the most important factors pertaining to the issues on appeal. There's no evidence of actual consumer deception or materiality. There's neither a consumer survey nor testimony of any actually confused consumers. There's no evidence of harm. There is no evidence of diverted sales, no evidence of pretrial corrective advertising or plans for prospective corrective advertising. The Hunter-Karwash's claim was alleged to be a misleading advertisement, meaning ITW had to satisfy all five elements of this court's Pizza Hut test to prove liability. ITW failed to meet three of the Pizza Hut factors. But the elements, those were correct. You aren't disputing the legal correctness. This is purely that in spite of being told what the elements were, the jury just didn't have evidence to suffice for them? That's correct. They flat-out failed on ITW's evidence, flat-out failed on three of the five elements. The one I focused on was the substantiality requirement, and the court's circuit seemed to have had some disarray in how they required it, but this jury, you did get the instruction that obliged the jury to find a substantial segment was deceived, correct? I believe that's correct, Your Honor. So it's just a very high standard that you're facing if this is just a purely evidentiary attack? Your Honor, under Pizza Hut, ITW has to prove that each one of the five factors, and there's flat-out no evidence on three of the five,  so... Go ahead with your argument. I'm sorry, you go. How many consumers would have to give testimony that they had been confused or deceived? I'm sorry, could you say that again? You're saying there's no evidence. How many would constitute sufficient evidence that people had been deceived or confused? It needs to be an appreciable number, and I believe that there's at least one case that talks about a 20% number. It would have to be something like that. In this case, there's nothing. 20% of what? When you say 20%? Of consumers who were deceived by the misleading advertisement. How would they be identified? Total number of people who purchased the product, 20% of them? I think that's, to me, the overriding issue on that particular part of your appeal is how much evidence is required. I know there's some mention of a single blog post or someone who had tried to do the 100 car washes or something of that sort and commented on it, so the question really becomes a question of quantity in terms of evidence. You said that the record is void of evidence on three different factors under Pizza Hut, but we do have the one blog post. I thought the nature of the argument was that there was insufficient evidence for which the jury could make that finding. That's correct, Your Honour. There is insufficient evidence of harm and there is insufficient evidence of deception and materiality. And under Pizza Hut, ITW needed to show actual consumer deception because they were seeking monetary damages. OK, but explain to me the 20%, and I'll let you move on to what you were about to say. You just said 20%, and I didn't quite understand. So I believe the question that was put to me was how many consumers would have to be deceived for there to be liability, correct? And I said that it needs to be an appreciable number, and one case, whose name escapes me right now, talked about a 20% number. How would you get there? You know, that could be through a consumer survey. There's no consumer survey here. Certainly, if we're talking about actual confused consumers, there would need to be an appreciable number. And what is that? It would depend on the market. It would depend on the number of consumers, some of the things, Judge Enderhart, that you mentioned. Certainly, the one video that we have here, that's not enough. And I would not agree that that is a confused consumer, because it was a video reviewer who was testing the product and was not testing it for purposes of the 100 car washes. So I think there's a complete lack of evidence on that point. So on consumer deception, they had to show actual consumer deception because they were seeking monetary damages, and there is no actual consumer deception here. On materiality, there's no evidence that the 100 car washes claim mattered to consumers in their purchasing decision. ITW cited to no evidence of materiality at its closing. The district court cited to no evidence of materiality in the October 30th order. Why would your client advertise that this product keeps its positive effect on the vehicle for 100 car washes if it wasn't material to the decision to buy it? Doesn't it beg the question, when you say there's no evidence of materiality, the fact that your client is offering it as a reason to buy the product, isn't that evidence of materiality? No, it's not, Your Honor. The mere advertising of a claim does not make it material. Because otherwise, if it did, there wouldn't be a materiality element in the Pizza Hut test, and every single advertisement, just by virtue of it being made, would be material. So, you know, so that's... Is it only material if you can prove that they relied on that advertising to be deceived or confused? It's... Yes. It would be material if the consumers made the purchasing decision of the product because of that ad claim. They would have to prove their reliance. Which would be ITW's burden to prove. And they did not do so here. No evidence on that point whatsoever. And on harm, there's absolutely no evidence that consumers would have purchased Rain-X instead of Rain-Brella, but for the 100 car washes. And I want to just touch briefly on, before I move on to the financial remedies, that on harm, ITW points to some testimony from its senior executive, James Stone. And that is just testimony about general harm to the Rain-X brand. It's eight lines of testimony. There's no... He quantified the amount of damage to the brand, and certainly nothing in his testimony that tied that damage specifically to the 100 car washes claim. And so that would be insufficient. So turning to the financial remedies, there's a permanent injunction... Before you jump to that, what is your best... Because the circuits have explored these elements of misleading advertising. What's your best circuit for any of the three elements you've just discussed? What's your best authority where a court has said, as a matter of law, that's not enough? What case would you point to, even outside the Fifth Circuit? I would point to Pizza Hut. But in Pizza Hut and in IQ, we just articulated there has to be a significant segment of consumers deceived, but the court didn't say this is insufficient as a matter of law. In... In other words, I guess I'm asking you for when you highlight for us it's an appreciability amount. What's the best case that has looked at a jury determination or the facts alleged and said that as a matter of law is not an appreciable enough number of consumers? Your Honor, I don't have a case site right to hand. Yeah. That's all right. It's just that seems to be the direction of your argument is there may be someone who did this, said he was surprised and made the statements that he did, but you're saying that's not enough. Would two or three be enough? Where are we seeing courts say, as a matter of law, that's not enough? But we've covered it. Could you... What about on the harm? I thought under... I didn't think that you had to show actual losses to show harm in Lanham Act cases. For harm, there's two aspects of harm that are in this case. There's the harm that's necessary for the financial remedies. There's the harm that's necessary for liability under Pizza Hut. And for the harm for liability, you may not have to show actual loss sales, but there's got to be some economic injury. There's got to be some economic harm. And in IQ Products, it's phrased, this court phrased it in terms of whether consumers would have purchased the plaintiff's product instead of the defendant's product but for the advertisement. Okay, so that's the harm that we're talking about. There could be, you know, harm to the brand, but the point is that there's no specific evidence But all three claims were direct comparisons by ours because it's better, essentially, no? Or at least two of them were. Right, the last two times longer, that's a comparative advertisement. The 100 car washes, which is the ad claim that I'm discussing here, that is not a comparative ad claim. That is just specifically a claim about our own product, about Rust-Oleum's own product, that it is durable enough to withstand 100 car washes. Okay, so on the financial remedies, there's a permanent injunction in this case, and that makes this not a case for financial relief. Because of the permanent injunction, which is the standard remedy in a Lanham Act case, since late 2018, when the injunction went into place, Rust-Oleum has stopped using the ad claims in connection with Rainbrella. And so this permanent injunction remedies Rust-Oleum's actions. Any financial relief that would then be, you know, awarded has to be subject to the principles of equity, cannot be punitive. There's two awards here, disgorgement and the corrective advertising. On disgorgement, ITW has no legal basis for disgorgement because there's no diverted sales. And because of that, it makes the disgorgement inequitable and punitive, and the disgorgement award should be vacated in its entirety. And so that would be for across all three of the advertising claims that were made. And the... In this circuit, you use the Pebble Beach factors to determine whether disgorgement in a Lanham Act case is equitable. Diverted sales is the second factor in the Pebble Beach test, and it's a very important factor. The failure to prove diverted sales makes disgorgement an inequitable windfall under this course holding in retractable technologies. If the disgorgement is equitable under Pebble Beach, then you've got to turn to the second aspect of whether the profits are attributable to the Lanham Act violation. And the attribution requirement is very important because it grounds an award of disgorgement in the actual harm. So it looks to see whether there's been any actual harm to the plaintiff. And in retractable technologies, this court stated that disgorgement without harm is an uncommon remedy in a false advertising suit. So here, without the diverted sales, there's not the actual harm to ITW that would be sufficient for disgorgement. Now, the district court erred at this point in its analysis in the October 30th opinion because it said it did not need to consider harm as to damages because the jury found that ITW was harmed by the claims. And so what the district court does is it says there's sufficient harm for liability, and because of that, there's going to be disgorgement, that that satisfies the attribution requirement. But in retractable technologies, this court specifically warned against conflating harm for liability with the injury that's necessary for disgorgement. And the district court made this exact error. And a quick word about willfulness, which is also one of the Pebble Beach factors. Willfulness is defined as acting voluntarily, intentionally, and with a specific intent to cause likelihood of consumer confusion. Willfulness does not mean that disgorgement should be awarded. Diverted sales are still critical, but the absence of willfulness would mean that disgorgement is inequitable. And here, there's no evidence of willfulness, and district court pointed to none when it adopted the jury's finding of willfulness. Now, on corrective advertising... The willfulness finding was as to all three claims? You know, Your Honor, that's one of the problems in this case, is that the willfulness instruction to the jury said one or more of the claims. And so you cannot tell. None of us in this courtroom today knows whether the jury thought that Rustalliam acted willfully on the last two times longer claim, for example, and not the 100 car washes claim. It's just unknown. On the corrective advertising, corrective advertising is a compensatory award, and it should be vacated here because there's no evidence of pretrial corrective advertising. And on the prospect of corrective advertising, there's no evidence in the record that they have any plans to run advertising. What that would cost, what it would look like, and very importantly, what the messaging would be in the corrective advertising. It's just an award... The jury award of corrective advertising that was modified by the district court, it's strictly a windfall. They're just going to take the money, they're just going to put it in their pockets, and they're not going to run any corrective advertising. You don't dispute that had there been evidence of prospective corrective advertising, an award would it be appropriate, just as a matter of law? No, because I don't... I think corrective advertising is not automatic. It's not... It has to be subject to the principles of equity, and in this case, where it's tacked on to a disgorgement award, I don't believe it's equitable whatsoever. So I would dispute that. Your red light is on. But that still means you get five more minutes at the end. Thank you, Your Honor. Four? Okay, yes. Good morning, Your Honors. Good morning. May it please the Court, my name is Bradley Cohn, and I represent the Appellee and Cross-Appellant Illinois Toolworks. After evaluating 12 witnesses and 76 exhibits, the jury in this case reached a unanimous verdict. This morning I hope to discuss evidence supporting the jury's verdict on the 100 car washes claim, evidence supporting the jury's verdict on willfulness, why a monetary award was proper, and lastly, why the district court erred when it reduced the jury's corrective advertising award. Starting with the 100 car washes claim, I'd like to address one of the issues that Your Honors have raised, which is the question about deception and how much deception evidence is necessary. This circuit has never established, and we're not aware of any circuit that has established, a bright-line rule as to how much evidence of deception is necessary. The standard says that you either need evidence of actual deception or evidence of a tendency to deceive. And oftentimes the evidence on the tendency to deceive is done by a survey, and oftentimes those surveys have certain thresholds you might want to meet, like 12, 15, or 20%. But in terms of when you're coming forward with actual deception evidence, we're not aware of this court or any court setting a bright-line rule as to how many instances of actual deception you need. But did you have any? We did, Your Honor, and that's the online... But substantial can't be one. I mean, the law of the case here, the instruction on the element was substantial. Yes, that's correct. And so how can substantial be one? It just... Well, so it's either actual deception evidence or a tendency to deceive a substantial number of consumers. That's from Pizza Hut. But as I thought the jury was instructed here, it didn't distinguish and carve out the two. You just accepted an element that said the jury had to find substantial numbers. Well, it had... As the instruction reads, you either have to have evidence of actual deception or a tendency to deceive a substantial number of consumers. Okay. Well, I'll look back at it. You really think it was disjunctive, the jury was told to be unanimous as to one or the other? No, Your Honor, but what I'm saying is that in this case, we have a powerful piece of actual deception evidence, the online consumer... Okay, but I may be confused. I thought in this case the jury was told it had to find deception as to a substantial number. Yes or no? The elements. Yes, Your Honor. Okay. So therefore, I'm interrupting you just to get my point out, but disagree with me if I'm wrong. Therefore, doesn't it seem just intuitive to ask, what did you have besides one? Right. So the jury looked at this piece of evidence. They actually looked at it. It's a seven-minute online review. The jury viewed it twice with two different witnesses, and the jury was entitled to evaluate this instance of deception and whether or not it reflected what typical consumers would experience. I understand that. Is that what you argued in closing argument, that you can infer that substantial other people would have responded the way this one person did? Is that how you argued in closing argument? We argued in closing, Your Honor, that we had evidence of deception. We also argued that actual deception can also be inferred from a bad faith intent. And so here we do have evidence of a bad faith intent. And you run into the difficulty of that willfulness finding wasn't particularized as to each claim. Well, the jury was entitled. If you look at this situation, what happened is that Rustoleum essentially based this claim on an unrealistic consumer experience and withheld that information from the consumers. And just again on that, if you fall back to that argument, did the jury get told that it can presume deception from willfulness? I don't think it was. The jury was not instructed on that, Your Honor. Some circuits have said that, but that, again, isn't what the law was given in this case. That's correct, Your Honor. So I do think you're going to have to show a substantial number. Well, the way the test reads is that you either need actual deception evidence or a tendency to see the substantial number, and no court has ever set a bright line rule or elevated quantity over quality. And so here we have a powerful piece of evidence that the jury saw twice. Last time I'll hammer on this point, though. When you say that's what the test is, you're drawing it from Pizza Hut. That's correct, Your Honor. I'm asking what this jury was told. And this jury wasn't told they could do one or the other, I don't think. This jury was told you've got to find that a substantial number of consumers. Well, the jury instruction was drawn from what was consistent with and drawn from the Pizza Hut view. Are you asking us to adopt the presumption now as our circuit's law? No, Your Honor. I don't think it's necessary in this case to adopt the bright line rule or even that presumption if the court doesn't want to. I mean, there is evidence of actual deception. If the court wants to opine on this question of whether or not you can infer bad faith, whether or not the inference of bad faith can support the inference. I apologize. Whether or not evidence of bad faith can support the inference that there was actual deception. Obviously, the court can do that. So your argument is that this record has sufficient evidence without the presumption? We believe that's correct, Your Honor. It has sufficient evidence without the presumption. But if there were any question on that point, that certainly evidence does support the proposition that with the intent to deceive that was there, the cause of the reliance on an admittedly unrealistic consumer experience to tell consumers, and consumers want to know how long the products last. That's what consumers want to know in Rust-Oleum. I know you were going to get there, but what is the single best piece of evidence showing bad faith to support that willfulness finding? What is the single in this record, because it was a trial, what would you point to as the most sort of glaring? Well, it's that with the single most glaring point is that Rust-Oleum admitted that they relied, for their claim, they were relying on a test that they knew and admitted was not a realistic consumer experience. So they had the lab person do the 100 car washes in two days. It seems like it could have been they thought it was just durability. And then admittedly you may have shown that it was, well, the jury found that you did so, that it was misleading because the consumer would think that really meant car washes over a lot of time. But where's the bad faith in that? Well, I was trying to reduce it to you asked. I did ask one, but often for willfulness and bad faith there is sort of something sinister. Sure. Well, there's a few other bricks in the wall. And the first is that consumers want to know how long the products last. And Rust-Oleum's own senior brand manager admitted that. They know consumers want to know how long it lasts. But instead of saying what they know internally, which is the product lasts about two to three months, they don't say our product lasts two to three months. They say it lasts over 100 car washes. And then they don't provide any explanation or disclosure for why they're saying that. They know internally it's based on an unrealistic consumer experience. There was no contact, right? What's that? Car washes were just like water being sprinkled on the windshield. That's correct. There was no windshield wiper. There was no contact. There was no scrubbing. That's correct, Your Honor. Was that the fraud? Well, there were touchless car washes over the course of two days. And then in the TV commercial, they show the phrase 100 car washes, and they show a car emerging from a car wash with scrubbers and brushes. And you can see that image on page seven of our brief. Well, I got a little confused about that. A hydrophobic, that's the word? When I take my car in and the things come down on the windows, is that hydrophobic or is that not? So hydrophobic. What's touchless and what's not touchless? Right. So hydrophobicity means water repellency. And so what happens when you put this material on your car, this water repellent on your car, is that it abrades over time. And that's what came out during the trial, is that it abrades over time either because of weather or wiper blades or other contact. And so when you run a car through 100 touchless car washes and nothing's touching it but water, it's not going to abrade at the same level as when you have Does the record reflect that when you do your products, you do it with touchless ones? Your lab tests are touching ones? Your Honor, there's no evidence. No, I mean, the evidence about ITW's testing was that it was with wiper blades. But ITW didn't make a claim about, you know, an advertising claim on this. But, no, touchless car washes is just something that Rust-Oleum came up with. With respect to the harm on the 100 car washes claim, Rust-Oleum says, well, there's no evidence that the 100 car washes claim is connected at all with ITW. But that's not what the jury heard. Because the 100 car washes claim was an integral part of the comparative advertising claim or claims that were being run against the Rain-X brand. Again, going to the TV commercial, which was nationally broadcast on networks like ESPN and Discovery Channel and History Channel, MSNBC. And the TV commercial says, Rainbrella lasts two times longer than Rain-X. We ran it through 100 car washes to prove it. So they themselves, Rust-Oleum themselves, are tying the 100 car wash claim into the admittedly false last two times longer claim. And so there was enough evidence there for the jury to infer that that 100 car washes claim was also going to be harming Rain-X and ITW. On the issue of willfulness, there was some discussion about the form of the jury instruction. We don't believe it was plain error. It could have been done differently, but it wasn't plain error. But importantly, the district court is the one who ultimately decides whether or not that finding of willfulness has any value in this case. And the district court apparently believed, having heard the evidence, that the way that the jury instruction was worded was sufficient for its purposes. And certainly Rust-Oleum did not object to the wording of this jury instruction during the jury charge conference. Let me ask you a question about the damages, about the amount that was awarded for corrective advertising. But you didn't do any, and you don't plan to do any. So why would you be entitled to that award? Just to clarify, Your Honor, there was no evidence that we don't plan to do any. The evidence was that we hadn't done any yet, and we didn't have concrete plans as to what it would be. You would just need a contract with a PR firm, but you don't have that. Well, Your Honor, the reason that the district court didn't require that and other courts don't require that is because it creates litigation and litigation. If you start running your corrective advertising before the jury has even decided what claims are false, or if you've planned out your corrective advertising without knowing what claims are false, what the injunction is going to be, how much money you'll have to spend on the advertising campaign, what you would do is create litigation and litigation, and the parties will fight at trial about whether or not what you did or what you planned to do, is it justified, is it correct, why did you spend the money here, why aren't you planning to spend the money there. ITW is prepared to wait until the final decision in this case and then plan out. So it's that they don't know yet what award there will be and what claims will ultimately be found to be false or misleading that needs to be incorporated into whatever advertising they wind up doing. As I understand it, your cross appeal relates to the amount of the award of the corrective advertising, is that correct? That's correct, Your Honor. And what evidence was there for the larger amount that you're seeking? So the jury heard evidence about, well, let me back up and say, a corrective advertising award could be looked at in two ways. One is, can you quantify the injury to reputation? And the other way you could look at it is, what is a fair estimate of the cost to repair the injury? And here the jury heard evidence about how and where Rainbrella and these deceptive advertising claims were disseminated. The national TV broadcast, which was, again, on ESPN and History Channel and MSNBC. The YouTube and Facebook advertising that was done. The internet banner ads and so on. The jury learned that Rust-Oleum spent $1.3 million and generated $1.3 million in sales. And so as the district court found, there was evidence in the record and some other things, there was evidence in the record from which the jury could craft an award. We asked for $1.3 million, the entire amount. We said if the value of what you got was $1.3 million because that's what you spent, we should be entitled to that, and the jury awarded 70% of that amount. And then what happened is after trial, the judge came in and applied a 25% rule that ITW had wanted to present to the jury. It's a guideline, we believe, a 25% guideline. And we wanted to discuss with the jury whether or not it was appropriate under the circumstances of this case to follow the 25% guideline or depart from it. In other cases, juries and courts depart from the 25% guideline. We want to discuss that with the jury. Rust-Oleum objected to that instruction. The jury didn't get it. And then after trial, when Rust-Oleum was dissatisfied with the amount of the corrective advertising award, they went to the court and said, oh, now we think that the 25% guideline should be imposed. And so that's the difference there. That's in the cross appeal where the difference is in the approach. There was a discussion on profits about the retractable technologies case. And while in retractable technologies there was no award of profits and no evidence of diverted sales, and here we don't have evidence of diverted sales, but this case differs from retractable technologies in at least three critical ways. The first is that in our case the district court found that disgorgement of profits was appropriate, whereas in retractable technologies it was the other way around. The district court found that disgorgement of profits was not appropriate. In this case, the district court found that the injunction was not sufficient to remedy the harm. In retractable technologies, the lower court found the injunction was sufficient to remedy the harm. And lastly, in this case, ITW tested its proof of damages to the jury. It put the question to the jury. And the jury found that disgorgement of profits was appropriate, and the jury noted that in its October 30th order in this case. In retractable technologies, this court pointed out that the plaintiff in that case didn't put the proof, its proof of damages to the jury. Instead, it waited until after trial to raise the issue of disgorgement of profits. So the retractable technologies case, while it does have some bearing on this, the circumstances, the facts are quite different in terms of what was happening underlying at the district court level. On the question of whether or not the profits were attributable to the Lanham Act violation, the jury heard quite a bit of evidence on that. The jury saw the internal Rust-Oleum document where it says that the, described the plan was to, quote, attract and steal Rainex's current loyal following, end quote. The jury learned that the television commercial was an important part of the launch of Rainbrella and important for Rainbrella to break into the market. The jury learned that the last two times longer claim from Rust-Oleum's perspective would set Rainbrella apart, and that's a false claim that is not even being challenged here. And the jury also learned that the 100 car washes claim Rust-Oleum believed was a, quote, game-changing claim, end quote. On corrective advertising, I just want to go back to another point here that's raised in Rust-Oleum's brief, this question about ITW running advertising for its water repellents. The jury heard the evidence that the harm to the Rainex brand from the false advertising is really to the brand as a whole, not just to the brand with respect to water repellents. And the jury also heard that when ITW does its advertising, while it focuses on some innovation issues, it's advertising that boosts the Rainex brand as a whole, and also water repellents specifically. So the jury heard evidence about how ITW advertises and how the harm from the Rainbrella false advertising would impact the Rainex brand, and that would also play into the decision to award corrective advertising. On the issue of the cross-appeal, part of the issue is also just a matter of fundamental fairness. We believe the defendant can't have it both ways. If Rust-Oleum felt that the 25% guideline was a theory for limiting damages, then it was their obligation to take that to the jury and have the jury decide whether or not that was a fair limitation on the damages. It was not appropriate to withhold that from the jury, to object to ITW's instruction on that point, and to deny ITW the opportunity to share that and discuss that with the jury. Isn't that to a large extent an application of a legal principle insofar as the amount of attorneys' fees available for recovery, or I should say advertising available for recovery, isn't that rooted in some of the case law, or did I misread that? Well, we cited case law, Your Honor, for the proposition that if a defendant feels that there's a limitation on damages, then that's something that they have to raise. And here we believe that this was an issue for the jury to decide whether or not to depart, that there is a 25% guideline and that it's something they could use, but they could depart from it one way or another. They didn't even have to go up to 25% if they want, but ITW wanted the opportunity to present that guideline to the jury and have them consider it. I see that I'm out of time, Your Honors. Unless the Court has any further questions, ITW respectfully requests that the October 30, 2018 order of the Court and the March 5, 2019 order of the Court, that those orders be affirmed except for the district court's reduction of the jury's corrective advertising award, which we respectfully request be reversed. Thank you. Rebuttal, you have four minutes. Just a couple of points, Your Honor. First, with respect to deception, the tendency to deceive question that was put, the jury was instructed on the Hunter Car Wash's claim that ITW had to show the statement or has a tendency to deceive a substantial segment of potential consumers. So two things on here is that, one, is that ITW had to show actual deception because it's seeking monetary damages under Pizza Hut. With respect to the question that was put to me earlier about what is a substantial segment and what are cases outside of the circuit, there is a case which we cited in our brief, Johnson & Johnson, which is in the Third Circuit, which collects cases and says that 20 percent would be sufficient. So when we're talking about what is a substantial segment of potential consumers, I think it's got to be that number, 20 percent north of 20 percent. Nothing here that approaches that whatsoever. In your closing argument, did you make that exact argument to the jury? You haven't heard there was 20 percent? I don't believe we put the 20 percent number to the jury. But you emphasized that they just heard from one person? Absolutely. And as I said earlier, I also would not agree that that one person, which is this online video review that we're talking about, it's not a consumer. It's a video reviewer, a person who's trying to get people to watch his video build up his traffic. It's not a person, a consumer who went and purchased the product because of the 100 car washes claim. There's no evidence in that video that says that. Well, he did buy it, and he said he was surprised. We don't know if he bought it. We don't know how he got it. He acquired it. He somehow got it. And he says that he's not testing the 100 car washes claim. He doesn't run it through a car wash. It has nothing to do with the 100 car washes claim, to be honest. He's just checking to see how well the product works in general. With respect to willfulness, Judge Higginson, you asked about, you know, what's the best evidence on willfulness? Was there a smoking gun? There isn't anything. There's no smoking gun here. There's no internal e-mail. There's no internal documents. There's nothing that talks about how we are trying, Rust-Oleum is trying to deceive consumers. In fact, the opposite is true. They tried to, Mr. Lavery testified that he was trying to dot his I's, cross his T's. They took the product to an outside lab for testing of the last two times longer claim. On the 100 car washes, Judge Clement, you asked about what is a touchless car wash. This was a commercial car wash that they ran a car through. It just doesn't have brushes. It's just done a different way. And if you go and look at the video. The thing that touches it is the water. Very strong sprays. And there's a video which is in the record, and it shows, if you go and look at it, the car shaking from the force of the water. So that's cited in our brief. On the 25% corrective advertising cap, there was no evidence in the record at all as to why they need to go past a 25%. So if there is going to be corrective advertising award, it should be limited to 25%. They don't say why they need more money. They don't say that they're going to run even more advertising. So, Your Honor, I see my red light is on. Thank you. Thank you, both counsel. We appreciate the arguments, and we'll call the second case.